*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 14-CF-534

NATHAN PIERRE JACKSON, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF3-11836-13)

(Hon. John McCabe, Trial Judge)

(Argued June 23, 2016                    Decided April 13, 2017)

*Claire H. Pavlovic*, Public Defender Service, with whom *James Klein* and *Mikel-Meredith Weidman*, Public Defender Service, were on the brief, for appellant.

*Nicholas P. Coleman*, Assistant United States Attorney, with whom *Vincent H. Cohen, Jr.*, Acting United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, Assistant United States Attorney, were on the brief, for appellee.

Before FISHER and BECKWITH, *Associate Judges*, and STEADMAN, *Senior Judge*.

Opinion for the court by *Associate Judge* FISHER.

Opinion by *Associate Judge* BECKWITH, concurring in part and dissenting in part, at page 20.

FISHER, *Associate Judge*:  Appellant Nathan Jackson appeals his convictions for assaulting and robbing Corinthea Thompson.  He primarily argues that the trial court erred in denying his motion to suppress because the police seized him for a show-up based on an "anonymous" and "uncorroborated" tip provided by the victim's mother.  He also mounts a facial challenge to the 2013 version of D.C. Code § 22-4504 (a), contending it violated the Second Amendment by banning the carrying of pistols in public.  We reject these arguments and affirm his convictions.

## I.  Background

Evidence at the suppression hearing showed that shortly after noon on July 9, 2013, appellant Nathan Jackson approached Corinthea Thompson as she was walking down the street and demanded, "[g]ive up your shit."[1]  When she refused, appellant struck her on the head with a "silver and black-colored handgun," knocking her unconscious, before stealing her watch and gold necklace.

---

[1]  Citing *Dockery v. United States*, the government states that we may consider "both evidence offered at the suppression hearing and [evidence] admitted at trial."  853 A.2d 687, 694 (D.C. 2004) (internal quotation marks omitted).  Other precedent seems to hold that, if we look outside the record of the hearing, we are limited to considering "undisputed trial testimony."  *See West v. United States*, 604 A.2d 422, 427 (D.C. 1992).  Because the evidence presented at the suppression hearing is sufficient to sustain the trial court's ruling, we need not resolve this issue.

Officer Dion Smith arrived shortly thereafter, as did the victim's mother, who spoke with both her daughter and the officer. The victim told Officer Smith that the robber was "a dark-complected, black male," anywhere from five feet ten inches to six feet in height, 150 to 160 pounds, "with dread locks" and a thin build.

Approximately forty-five minutes to an hour after the robbery, the victim's mother, Shirley Thompson-Wright, called the police "for a second sighting as to where the suspect was in reference to her daughter's robbery."[2] Officer Stephen Chih, who "had heard about the robbery," responded to the intersection of 35th and East Capitol Streets. When Officer Chih arrived, the victim's mother was "cursing," "yelling[,] and screaming," saying that "the suspect was up in that apartment right now" and that if the police "don't go in there, I'm going to go in

---

[2] At the time, the police did not know that, after speaking to her daughter at the crime scene, Shirley Thompson-Wright initiated her own investigation. The victim had told her mother that her assailant was the "boy from around the neighborhood that always drove the red car and that always hung out with . . . Chucky." Ms. Thompson-Wright then drove "around the neighborhood" and encountered Rogann Matthews, a neighbor who had (1) witnessed the assault and robbery, and (2) knew where Chucky lived. This information led Ms. Thompson-Wright to Chucky, who in turn gave her the address where appellant was staying: 3425 East Capitol Street. Chucky also pointed out a photo of appellant on his wall; Ms. Thompson-Wright grabbed the photo before leaving. Because the police did not know this information at the time they seized appellant, we do not rely on it when reviewing the denial of appellant's motion. See note 1, above.

there and handle whatever I got to do." She provided the address 3425 East Capitol Street, apartment 301.

Officer Chih asked the victim's mother, Ms. Thompson-Wright, to calm down and to tell him "specifically what [wa]s going on," because he had not yet learned the particulars of the robbery (such as the victim's description of the robber). Ms. Thompson-Wright explained when and where her daughter had been robbed, and told him she had a picture of the suspect. She then gave Officer Chih a photograph which depicted a "[b]lack male, dark complected, with dreadlocks." She also told him she had received the photograph "from the neighborhood" but had not witnessed the robbery. Officer Chih then requested "other units to respond."

After backup units arrived, Officer Chih left Ms. Thompson-Wright with other officers and turned his attention to locating the suspect. Accompanied by Officer Curt Bonney, he went up to the third floor of the apartment building with the photograph tucked in his uniform shirt and the understanding that "[t]here was still a suspect outstanding with a firearm."

When Joyce Lewis answered the officers' knock, they explained that a crime of violence "had occurred earlier in the day" and "that there was information that a potential suspect was in her apartment." They asked whether any males were in the apartment, and Ms. Lewis said that only her son was there. Showing the photograph to Ms. Lewis, Officer Chih asked if that was her son. She replied that it was not, but did not indicate that she knew the person in the photograph or tell the officers that he was present.

Ms. Lewis invited the officers inside, and her son Craig Lewis came to the door. It was apparent to Officer Chih that Craig Lewis was not the person in the photograph. The officers requested Craig's identification and asked whether anybody else was inside. Craig said his identification was back in the bedroom, and Ms. Lewis and Craig indicated "that there was . . . nobody else inside the apartment."

Following Craig to the bedroom, the officers were "surprised" to find "two other subjects" inside – the appellant and his brother, Rico Jackson. Appellant appeared "[v]ery nervous," and was "[w]ide eyed, kind of breathing a little bit heavy, constantly staring at his brother, back and forth, making eye contact with his brother." The brothers looked like each other and looked like the photo.

Noting that appellant's brother Rico had a facial tattoo that was not depicted in the photograph, however, Officer Chih focused on appellant as the primary suspect. His suspicion solidified before the show-up procedure, when Craig Lewis told him that Rico had spent the night at the apartment, but appellant had just come in 15-20 minutes before the police arrived.

Officer Chih told appellant not to make any sudden moves and asked for identification. When appellant stated that his ID was in his wallet in his back pocket, the officer told him to stand up very slowly and remove it. Officer Chih also told appellant he was going to "pat him down for any type of weapons." The pat-down revealed no weapons, but Officer Chih noticed a white, plastic bag directly underneath where appellant had been sitting. Picking up the bag, Officer Chih immediately could feel that it contained expended shell casings.

The atmosphere became "[v]ery tense," and based on "the nature of the original crime," "the demeanor of both Nathan and Rico Jackson being very intense," and the fact that Ms. Thompson-Wright had predicted the officers would find the robber there (despite the Lewis's denials), Officer Chih alerted the other officers that there was "potentially a gun in [the room.]"

Without investigating further, Officer Chih left the room "to coordinate [a] show-up identification process" because an eyewitness to the crime had been found. (It seems that Ms. Thompson-Wright may have told the police about the witness, Ms. Matthews, while Officer Chih was upstairs with appellant.) Officers Lavern Miller and Shaquinta Gaines remained in the room, but appellant began acting suspiciously. Pretending to be tired, he laid back and began reaching underneath the sheet at the head of the bed. Officer Miller said, "I know what you're doing. You need to stop moving and sit up right now." Appellant complied. After Officer Chih took appellant outside for the show-up, Officer Miller "pulled back the sheet from where Nathan Jackson was reaching" and found "a silver and black-colored handgun . . . [with] six[, live] rounds in the magazine."

Outside, Ms. Matthews "immediately" identified appellant as the "man who had the gun and was robbing the girl." Officer Chih then arrested appellant; as he returned to the apartment, he heard "a radio transmission" revealing that Officer Miller had found the weapon. The officers then obtained written consent to search the apartment from both Joyce Lewis and Craig Lewis. That search revealed the expended cartridge casings, the firearm and ammunition, and clothing that matched the victim's description of the robber's attire. The police did not find Corinthea Thompson's watch or necklace.

On January 29, 2014, appellant's trial commenced before the Honorable John McCabe, and on February 7, 2014, the jury found appellant guilty of armed robbery, assault with a dangerous weapon ("ADW"), and other charges related to the firearm and ammunition.[3]

## II. Fourth Amendment

Appellant argues that the trial court should have granted his motion to suppress the identification by the eyewitness and the physical evidence found in the apartment because the police did not have reasonable articulable suspicion to detain him. He asserts that the information Ms. Thompson-Wright gave to the police (1) "amounted to an anonymous tip" because it was "attributed" to "the neighborhood grapevine" and (2) was not sufficiently corroborated.

---

[3] The other charges decided by the jury included carrying a pistol, possessing an unregistered firearm, unlawful possession of ammunition, and two counts of possessing a firearm during a crime of violence or dangerous offense ("PFCV"). The trial court found appellant guilty of committing an offense while on release.

## A. Standard of Review

When reviewing the denial of a motion to suppress, we "must defer to the court's findings of evidentiary fact and view those facts and the reasonable inferences therefrom in the light most favorable to sustaining the ruling below." *Joseph v. United States*, 926 A.2d 1156, 1160 (D.C. 2007). "The court's legal conclusions on Fourth Amendment issues . . . are 'subject to de novo review.'" *Id.* When conducting that de novo review, however, we "give due weight to a trial court's finding that the officer was credible and [that] the inference [he drew] was reasonable." *Ornelas v. United States*, 517 U.S. 690, 700 (1996).

## B. Reliability of the Tip

"The touchstone of the Fourth Amendment is reasonableness . . . measured in objective terms by evaluating the totality of the circumstances." *Goines v. United States*, 964 A.2d 141, 144 (D.C. 2009) (internal quotation marks omitted). "[I]n keeping with the Fourth Amendment," *Howard v. United States*, 929 A.2d 839, 845 (D.C. 2006) (internal quotation marks omitted), the police may conduct a brief, investigatory stop of a suspect if they "have [a] reasonable suspicion,

grounded in specific and articulable facts, that [the] person they encounter was involved in or is wanted in connection with a completed felony." *United States v. Hensley*, 469 U.S. 221, 229 (1985).

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

*Alabama v. White*, 496 U.S. 325, 330 (1990). Nevertheless, the reasonable suspicion standard "requires at least a minimal level of objective justification for making the stop." *Wilson v. United States*, 802 A.2d 367, 369 (D.C. 2002) (internal quotation marks omitted). That is, the police "must have more than an 'inchoate and unparticularized suspicion or hunch of criminal activity.'" *Howard*, 929 A.2d at 845 (citation omitted).

Here there was no doubt that a crime had occurred—very recently, and nearby. The issue is whether the police had a reasonable, particularized suspicion that appellant was the assailant.

"Prior to 1983, cases involving informant tips were analyzed under a somewhat rigid and mechanical two-pronged analysis – the *Aguilar-Spinelli* test." *Goldston v. United States*, 562 A.2d 96, 98 (D.C. 1989).[4] That test required an adequate showing as to "both the veracity or reliability of the informant and the informant's 'basis of knowledge' for the information." *Id.* In *Illinois v. Gates*, however, the Supreme Court rejected this "rigid" test, noting that "[i]nformant's tips, like all other clues and evidence coming to a policeman on the scene may vary greatly in their value and reliability." 462 U.S. 213, 232 (1983) (internal quotation marks omitted). A tip can be a sound basis for forming reasonable articulable suspicion or probable cause even if it "might well not have survived the rigid application of the 'two-pronged test' that developed following *Spinelli*." *Id.* at 242 n.12.

Courts must now focus on "the overall reliability of a tip." *Gates*, 462 U.S. at 233. *See generally Navarette v. California*, 134 S. Ct. 1683, 1688 (2014) ("Even assuming for present purposes that the 911 call was anonymous, . . . we conclude that the call bore adequate indicia of reliability for the officer to credit the caller's account."). Reliability is evaluated under the "totality of the

---

[4] *See Spinelli v. United States*, 393 U.S. 410 (1969); *Aguilar v. Texas*, 378 U.S. 108 (1964).

circumstances" – a "practical, nontechnical" process that leaves room for law enforcement officers to "formulate[] certain common-sense conclusions about human behavior." *Gates*, 462 U.S. at 231-32 (internal quotation marks omitted); *see also United States v. Cortez*, 449 U.S. 411, 418 (1981) (the evidence "must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement").

We recognize, for example, that "[a] person who . . . voluntarily comes forward and identifies himself or herself, is more likely to be telling the truth." *Brown v. United States*, 590 A.2d 1008, 1016 (D.C. 1991). Moreover, "corroboration through other sources of information reduce[s] the chances" that an informant is simply telling "a reckless or prevaricating tale." *Gates*, 462 U.S. at 244-45 (internal quotation marks omitted). When there are "supplemental" indicia of reliability, "[t]his court's post-*Gates* decisions" need not, and therefore "do not always discuss, or even mention, the source's basis of knowledge." *Joseph*, 926 A.2d at 1165.

**C. Validity of the Seizure**

The police did not need reasonable, articulable suspicion to approach the apartment, or even to enter it. As the evidence showed, the residents consented to the entry. Therefore, the trial court properly found that "there was no fourth amendment violation by the[ police] walking into the apartment." Judge McCabe also found that the police had reasonable articulable suspicion when they subsequently detained appellant because "[o]nce the door to the . . . bedroom opened" to reveal appellant, "[the] tip has panned out."

The court concluded that even though there "was fairly thin information as to the basis for the information that Officer Chih was given by the complainant's mother," the fact that appellant was where she had predicted he would be, the fact that he matched the photo, and "the fact that the police were told by Mr. and Ms. Lewis that there were no other males in the apartment" justified the officer's brief detention of the defendant for a show-up.[5]

---

[5] The court also found that Officer Chih's "frisk" of the bag "was really permissible under all of the circumstances," as he did not open the bag but just felt the outside of it. Finally, Officer Miller's decision to pull back the bed sheet was just "a very minor intrusion" that did "not violate Mr. Jackson's fourth amendment rights."

To determine the permissibility of that detention, we turn first to the tip that led the officers to the apartment building. When evaluating Ms. Thompson-Wright's "credibility and veracity," *In re S.B.*, 44 A.3d 948, 952 (D.C. 2012), we emphasize that her interactions with the police were not anonymous. She identified herself; was present before, during, and after the police investigation of her tip; and "could be held 'accountable' for the information [s]he gave." *Joseph*, 926 A.2d at 1160. These facts remove the case from the "*Florida v. J.L.* line of cases involving unidentified informants." *Id.* at 1162.

"[I]nformation from an identified citizen is presumptively reliable[,]" and "*rigorous* scrutiny of the basis of [her] knowledge [was] unnecessary." *Id.* at 1161 (emphasis added) (internal quotation marks omitted). "[T]here was nothing in this case to suggest that [Ms. Thompson-Wright] had any bias or motive to falsify information." *Id.* at 1164. To the contrary, she was the understandably angry mother of the hospitalized victim, and her clearly expressed interest was in finding and dealing with her daughter's assailant. Even so, the fact that Officer Chih knew relatively little about the basis of Mrs. Thompson-Wright's information before he detained appellant makes this a closer case. It is especially because the police had other "strong showing[s] of veracity [and] some other indicia of reliability" that we uphold the detention. *Id.* at 1165.

Although the police knew only that Ms. Thompson-Wright's information came from "the neighborhood," the photograph and address she provided indicate "a special familiarity with [appellant's] affairs" that the general public would be unlikely to have. *White*, 496 U.S. at 332. Even if we were to consider her only "a conduit" for the information she had gathered, Officer Chih independently corroborated important details of the tip. A consensual entry into Ms. Lewis's apartment revealed that appellant was precisely where Ms. Thompson-Wright said he would be. "[A]n informant [who] is shown to be right about some things, . . . is probably right about other facts that he has alleged." *Id*. at 331-32. Although the prediction regarding appellant's location was based on information provided by Chucky (an informant unknown to the police), the fact that the information turned out to be correct enhanced the overall reliability of the tip.

We should not ignore the corroborative circumstances under which Ms. Thompson-Wright's tip "panned out." Ms. Lewis had denied that anyone else was in the apartment, yet the police discovered appellant and his brother in the bedroom. Both were behaving nervously. Appellant tries to dismiss this behavior by asserting that nervousness "is an entirely natural reaction" to the presence of

law enforcement and that Ms. Lewis might have "had any number of reasons" to give the police a "single inaccurate statement."

Even if these assertions were true, "[a] determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." *United States v. Arvizu*, 534 U.S. 266, 277 (2002). Instead, Officer Chih reasonably could suspect that Ms. Lewis and her son had been trying to mislead the police so they would not find appellant and his brother and that appellant's nervousness reflected his fear of being caught – both reasonable possibilities which lent further credence to Ms. Thompson-Wright's tip. The justification for detaining appellant was markedly enhanced when Officer Chih learned (before taking him to the show-up) that appellant had recently arrived at the apartment (making it more likely that he was out in the neighborhood at the time of the robbery).

Assessing the totality of these circumstances, the trial court properly avoided the "sort of divide-and-conquer analysis" in which appellant engages. *Arvizu*, 534 U.S. at 274. It did not err in concluding that the police acted reasonably in commanding appellant not to make any sudden moves, in patting him down to check for weapons, and in detaining him until the show-up procedure was complete. *See Adams v. Williams*, 407 U.S. 143, 146 (1972) (holding that an

officer "making a reasonable investigatory stop should not be denied the opportunity to protect himself from attack by a hostile suspect . . . [and] he may conduct a weapons search limited in scope to this protective purpose."); *Womack v. United States*, 673 A.2d 603, 608 (D.C. 1996) (holding that a "temporary detention, designed to last only until a preliminary investigation [here, the show-up identification procedure] either generate[d] probable cause or result[ed] in the release of the suspect" is consistent with the Fourth Amendment) (internal quotation marks omitted).

## III. Did the Statute Clearly and Obviously Violate the Second Amendment?

Appellant contends that we should vacate his conviction for carrying a pistol outside his home or place of business ("CP") because former D.C. Code § 22-4504 (a) was facially unconstitutional. In other words, he asserts that no (valid) statute prohibited him from carrying the pistol.

As we explained in *Conley v. United States*, "[a] facial challenge imposes a 'heavy burden' on the claimant to establish that 'the law is unconstitutional in all of its applications.'" 79 A.3d 270, 276-77 (D.C. 2013). "[W]e do not examine whether appellant's conduct could have been criminalized under a hypothetical

statute," but appellant "must demonstrate that the terms of the statute . . . contain[] a constitutional infirmity that invalidates the statute in its entirety." *Id.* at 277 (internal quotation marks omitted).

The operative portion of the CP statute applicable at the time of this armed robbery stated: "No person shall carry within the District of Columbia either openly or concealed on or about their person, a pistol, or any deadly or dangerous weapon capable of being so concealed." D.C. Code § 22-4504 (a) (2013). (In that iteration, the statute did not mention a license.) The relevant penalty section provided: "A person who violates this section by carrying a pistol, or any deadly or dangerous weapon, in a place other than the person's dwelling place, place of business, or on other land possessed by the person, shall be fined . . . or imprisoned . . . ." D.C. Code § 22-4504 (a)(1) (2013).

As appellant did not challenge the statute before the trial court, we review for plain error. *Lowery v. United States*, 3 A.3d 1169, 1172-73 (D.C. 2010). Under this test, appellant must show "(1) 'error,' (2) that is 'plain,' and (3) that affected appellant's 'substantial rights.' Even if all three of these conditions are met, this court will not reverse unless (4) 'the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 1173 (internal

quotation marks omitted). "[A]ppellant bears the burden of persuasion on each of the four prongs of the plain error standard." *Id*. In this context, "'[p]lain' is synonymous with 'clear' or, equivalently, 'obvious.'" *United States v. Olano*, 507 U.S. 725, 734 (1993).

A separate division of the court recently considered and rejected the same attack upon the same statute. *In re T.M.*, No. 14-FS-199, 2017 WL 1034394 (D.C. March 16, 2017). For the reasons stated there, "the statute was not so clearly and obviously unconstitutional as to support reversal on plain error grounds." Slip op. at 16.[6]

## IV. Conclusion

We remand with instructions to vacate appellant's conviction for ADW and the corresponding PFCV conviction. In all other respects, the judgment of the Superior Court is hereby affirmed.

---

[6] Appellant also argues that his conviction for ADW, and the corresponding PFCV conviction, should merge with his conviction for armed robbery and the PFCV conviction associated with the armed robbery count. The government agrees, and so do we. We therefore remand the case to the trial court with instructions to vacate those two convictions, noting that the ADW and PFCV sentences run concurrently with the sentence for armed robbery.

BECKWITH, *Associate Judge*, concurring in part and dissenting in part: I dissent from the majority's holding that the photograph of Nathan Jackson "from the neighborhood" and the tip that he was in a certain apartment—also "from the neighborhood"—were sufficiently corroborated by Mr. Jackson's presence in the apartment, his nervousness when confronted and cornered by two police officers in a bedroom, and inaccurate statements by the apartment's residents about Mr. Jackson's presence to justify his seizure by the police. In my view, the tip and the photograph—although transmitted through a non-anonymous intermediary, complainant Corinthea Thompson's mother—came, for all intents and purposes, from an anonymous source ("the neighborhood"), "whose reputation [could not] be assessed and who [could not] be held responsible if [the] allegations turned out to be fabricated." *Florida v. J.L.*, 529 U.S. 266, 270 (2000). Further, the equivocal corroborating evidence in this case was insufficient to demonstrate that the "tip [was] reliable in its assertion of illegality," as opposed to its mere "tendency to identify a determinate person." *Id.* at 272. I would therefore hold that under the totality of the circumstances, the police lacked "particularized and objectively reasonable articulable suspicion" that Mr. Jackson was the person who robbed Ms. Thompson an hour earlier, *In re Z.B.*, 131 A.3d 351, 353 (D.C. 2016), and would reverse the judgment of the Superior Court.

**I.**

Although the majority fairly summarizes the sequence of events leading up to Mr. Jackson's seizure, as revealed in the suppression-hearing testimony, it may be helpful to restate the facts from the perspective of Officer Stephen Chih. Officer Chih was the officer who seized Mr. Jackson, and only the facts that were known to him matter to the Fourth Amendment analysis.[1]

Around forty-five minutes to an hour after Ms. Thompson was robbed, Officer Chih and Officer Curt Bonney arrived at the intersection of 35th and East Capitol Streets. Ms. Thompson's mother, Shirley Thompson-Wright, had called

---

[1] The majority does not rely on the "collective knowledge doctrine," which under certain circumstances allows the government to demonstrate probable cause or reasonable suspicion by "aggregat[ing] the knowledge" of multiple police officers. *McFerguson v. United States*, 770 A.2d 66, 72 (D.C. 2001). This doctrine generally applies only where one officer has communicated information to another or where, despite the lack of communication, the officers are at least engaging in a joint investigation in roughly the same location at the same time. *See Milline v. United States*, 856 A.2d 616, 620 (D.C. 2004); *McFerguson*, 770 A.2d at 72. Here, although other officers had been present on the scene some time before Officer Chih, and they had taken a description of the robber from Ms. Thompson, Officer Chih denied in his suppression-hearing testimony that he had been provided with this description. The collective knowledge doctrine thus would not be applicable.

the police to report that she had information about Ms. Thompson's assailant. "[A]t th[e] time" he arrived, Officer Chih "didn't really know too much . . . other than the fact that there was a report of a robbery reported by . . . Officer Smith." Ms. Thompson-Wright told Officer Chih and Officer Bonney that her daughter had been robbed, and "that the suspect to her daughter's robbery was staying up at 2345 East Capitol Street, apartment 301." "[S]he was yelling and screaming and . . . pointing to an apartment," and she threatened that "[i]f [the police didn't] go in there, [she was] going [to] go in there and handle whatever [she] got to do."

Officer Chih "learned in [his] brief conversation" with Ms. Thompson-Wright "that she herself had not actually witnessed the robbery." Ms. Thompson-Wright produced a photograph, however, which she claimed was a picture of the robber.[2] Officer Chih asked her where the information about the suspect and the photograph came from, and she "indicated that she just got [them] from the neighborhood." Officer Chih "didn't know at that time whether the person or people who had given Ms. Thompson[-]Wright that photograph . . . had witnessed the robbery." Officer Chih "was kind of baffled" by what Ms. Thompson-Wright

_____

[2] The photograph had disappeared by the time of suppression hearing, and the trial court was thus unable to review it. Officer Chih described the photograph for the trial court.

had told him, but he was "focused on trying to look for a suspect." He called for backup, and when it arrived, he and Officer Bonney entered the apartment complex and proceeded to apartment 301.

When Officer Chih and Officer Bonney knocked on the door of the apartment, they were greeted by Joyce Lewis, "the legal tenant." The officers "told her that a serious crime had occurred earlier in the day and that there was information that a potential suspect was in her apartment." They showed her the photograph and "asked [her] if there were any males that lived or [were] staying inside the apartment with her." Ms. Lewis responded, "[Y]es, I have my son here," and, at the officers' prompting, she called her son, Craig Lewis, to the door. The officers asked to see Mr. Lewis's identification card, but Mr. Lewis did not have it on his person. As described in the majority opinion, Ms. Lewis eventually let Officer Chih and Officer Bonney into the apartment, and the officers followed Mr. Lewis as he went to his bedroom to retrieve the identification card. Before doing so, the officers asked Joyce and Craig Lewis whether there was "anybody inside the apartment. And they indicated, no, that there was . . . nobody else inside the apartment."

24

Arriving at the entrance to the bedroom, Officer Chih saw that there were in fact two males other than Mr. Lewis inside, which "p[iqu]ed [his] suspicions": Mr. Jackson was seated on a bed, and his brother on a sofa. To Officer Chih, they seemed "[v]ery nervous"—they were "[w]ide eyed, kind of breathing a little bit heavy, constantly . . . making eye contact with" each other. Officer Chih thought that the two brothers looked "very similar" and that both resembled the person in the photograph. Officer Chih instructed Mr. Jackson and his brother "not to move" and soon after told Mr. Jackson to "stand up." The sequence of events that followed, described in the majority opinion, resulted in the officers finding ammunition and a weapon and in Mr. Jackson being identified in a show-up procedure.

## II.

In telling Mr. Jackson "not to move" and to "stand up," Officer Chih effected an investigatory stop, a seizure under the Fourth Amendment. *See Terry v. Ohio*, 392 U.S. 1 (1968). We should hold that this seizure was unlawful because Officer Chih lacked a reasonable suspicion that Mr. Jackson was responsible for Ms. Thompson's robbery. *Z.B.*, 131 A.3d at 353. Officer Chih did not know the source of the photograph or tip—except that they came "from the neighborhood"—

and had no way to assess the tip's reliability. And the tip was completely conclusory. The Lewises' possible dishonesty and the nervousness of Mr. Jackson and his brother in the presence of the officers—factors that our court and others have recognized as relatively weak—were insufficient to remedy these deficiencies.

## A.

Although "information from an identified citizen is presumptively reliable," *Joseph v. United States*, 926 A.2d 1156, 1161 (D.C. 2007), "courts are properly wary of sustaining seizures on the basis of anonymous tips, and require a substantial measure of corroboration of information anonymously provided," *Brown v. United States*, 590 A.2d 1008, 1015 (D.C. 1991). *See also Alabama v. White*, 496 U.S. 325, 329 (1990) ("[A]n anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity . . . ."). Where the identity—and thus the motive, credibility, and basis of knowledge—of an informant are unknown, it is "possible that the [informant]'s purported knowledge [i]s second-hand or third-hand or supposition or rumor or the product of a grudge against a rival or vengeance against an enemy." *Brown*, 590 A.2d at 1017. Further, a

known informant can "be held accountable"—criminally[3]—"for [his or her] false report." *Joseph*, 926 A.2d at 1161. An anonymous informant, by contrast, may believe anonymity will enable him or her to evade the consequences of a false report and thus be less apprehensive about lying. *See id.*; *see also Brown*, 590 A.2d at 1016 ("[A] citizen who prefers to remain anonymous would seem less reliable than a citizen willing to accept personal responsibility for his accusations." (quoting *Rushing v. United States*, 381 A.2d 252, 255 (D.C. 1977)) (alteration in original)).

"[A]nonymity takes on even greater significance where there has not even been a face-to-face confrontation between the person giving the information and the police." *Brown*, 590 A.2d at 1016 (quoting 2 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 3.4 (a) (2d ed. 1987)) (alteration in original). When an officer speaks to an anonymous informant in person, the officer has an "opportunity to observe the [informant]'s demeanor—'mannerisms, expressions, and tone of voice'—and thus evaluate the [informant]'s credibility

---

[3] *See* D.C. Code § 5-117.05 (2012 Repl.) ("[W]hoever shall . . . communicate or cause to be communicated to [the] Metropolitan Police force, or any officer or member thereof, any false information concerning the commission of any criminal offense . . . , knowing such information to be false, shall be punished by a fine . . . or by imprisonment . . . .").

and veracity." *In re S.B.*, 44 A.3d 948, 953 (D.C. 2012) (quoting *United States v. Romain*, 393 F.3d 63, 73 (1st Cir. 2004)) (footnote omitted). An officer cannot assess the reliability of a remote anonymous informant in this manner. Moreover, the risk of "an in-person informant . . . losing anonymity" is higher than that of a remote informant, furnishing more of an incentive for an in-person informant to be honest. *Id.* at 953.

The information Ms. Thompson-Wright gave to Officer Chih was, if not technically an anonymous tip, functionally equivalent to one.[4] The factors that

---

[4] The majority contends that because Ms. Thompson-Wright was not an anonymous informant, "rigorous scrutiny of the basis of [her] knowledge [was] unnecessary." *Ante* at 14 (quoting *Joseph*, 926 A.2d at 1161) (emphasis omitted) (alterations in original). It is questionable whether, if generalized, this is an accurate statement of the law—the majority relies on a truncated quotation from *Joseph* that leaves out two important qualifiers. *See Joseph*, 926 A.2d at 1161 ("[I]f an *unquestionably honest* citizen comes forward with a report of criminal activity—*which if fabricated would subject him to criminal liability*—we have found rigorous scrutiny of the basis of his knowledge unnecessary." (quoting *Illinois v. Gates*, 462 U.S. 213, 233–34 (1983)) (emphasis added)). But even if the majority's statement of the law were accurate, it would not justify this court in ignoring facts known to Officer Chih that cast doubt on the reliability of Ms. Thompson-Wright's information. The problem is not so much that Officer Chih failed to adequately scrutinize the basis of Ms. Thompson-Wright's knowledge, but rather that he failed to give sufficient weight to her own admission that the basis of her knowledge was either neighborhood rumor or conjecture or an anonymous source whose credibility and reliability were unknown. This court has never held that it should ignore facts that tend to undermine reasonable suspicion. *See Pridgen v. United States*, 134 A.3d 297, 301 (D.C. 2016) ("To determine whether police officers had reasonable suspicion, a court must review the *totality*

(continued…)

render anonymous tips presumptively unreliable are plainly present here. Notwithstanding that Ms. Thompson-Wright was probably motivated by a desire to help bring her daughter's assailant to justice, the motive of the source or sources of the information and photograph was completely unknown to Officer Chih. *See United States v. Monteiro*, 447 F.3d 39, 46 (1st Cir. 2006) (holding that a tip from an unnamed relative of a non-anonymous witness, relayed by the witness, was unreliable because, *inter alia*, "even if [the witness] was honest in his interactions with the police, his unnamed relative may have had her own motive for fabricating incriminating evidence"). For all Officer Chih knew, the source or sources were motivated by a grudge or a desire to "harass . . . [by] set[ting] in motion an intrusive, embarrassing police search." *J.L.*, 529 U.S. at 272; *Brown*, 590 A.2d at 1017. Similarly, Officer Chih knew nothing about the credibility of the sources or the basis of their knowledge. The tip could have been based on nothing more than "casual rumor or . . . [Mr. Jackson]'s general reputation." *Mitchell v. United States*, 368 A.2d 514, 516 (D.C. 1977). All that Officer Chih knew was that Ms. Thompson-Wright had no firsthand knowledge of the robbery.

---

(…continued)

*of the circumstances* present." (emphasis added)); *cf. Ramsey v. United States*, 73 A.3d 138, 147 (D.C. 2013) (holding that a seizure was unlawful because certain facts had "dispelled" the officer's reasonable suspicion).

Not only were the sources of the tip identifying Mr. Jackson unknown to Officer Chih, thus making it unlikely that they could be identified and held accountable if the tip turned out to be false, but they also did not even communicate with the police, thus making it unlikely that, even if they were later identified, they could be held liable for a false statement.[5] Moreover, because Officer Chih did not interact with the source or sources of the tip in person, he could not assess their demeanor, and he of course could not rely on a history of past dealings with the sources or their reputation for honesty and reliability. This court previously remarked that "an anonymous telephone tip is of the 'weakest reliability.'" *Brown*, 590 A.2d at 1016 (quoting *People v. Crea*, 126 A.D.2d 556, 559–60, 510 N.Y.S.2d 876, 880 (2d Dept. 1987)). A tip "from the neighborhood" would appear even less reliable.

---

[5] D.C. Code § 5-117.05 makes it a crime for a person to "cause to be communicated" to the police a knowingly false statement. Thus, if the anonymous source "from the neighborhood" knew or intended that Ms. Thompson-Wright would convey false information to the police, he or she could be prosecuted. Under those circumstances, however, it would likely be a challenge for the government to secure a conviction. It is beside the point, moreover, that Ms. Thompson-Wright "could be held 'accountable' for the information [s]he gave." *Ante* at 14 (quoting *Joseph*, 926 A.2d at 1160) (alteration in original). The concern is that the source or sources "from the neighborhood" were unreliable—not that Ms. Thompson-Wright was. And in any case, unknowingly relaying false information to the police—even negligently—would not subject Ms. Thompson-Wright to criminal liability. *See* D.C. Code § 5-117.05.

**B.**

Because the information and photograph relayed by Ms. Thompson-Wright to the police amounted to what was essentially an anonymous tip, they, "standing alone, would not 'warrant a [person] of reasonable caution in the belief that [the seizure of Mr. Jackson] was appropriate.'" *White*, 496 U.S. at 329 (quoting *Terry*, 392 U.S. at 22) (internal quotation marks omitted). There are, however, "situations in which an anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion.'" *J.L.*, 529 U.S. at 270 (quoting *White*, 496 U.S. at 327). Such corroboration must show that the tip is "reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *Id.* at 272. In the present case, the corroboration was too scant to provide sufficient corroboration.

First, it is not true that "the photograph and address [Ms. Thompson-Wright] provided indicate 'a special familiarity with [Mr. Jackson's] affairs.'" *Ante* at 15 (quoting *White*, 496 U.S. at 332). All that the photograph and knowledge of the address show are that after hearing from some source—whose reliability was completely unknown to Officer Chih—that it was Mr. Jackson who committed the robbery, Ms. Thompson-Wright was able to find *someone* in the neighborhood

who had a photograph of him and who knew where he could be found. Indeed, as the explanation of how Ms. Thompson-Wright came to acquire Mr. Jackson's photograph and address shows, once Ms. Thompson-Wright came to suspect that a friend of "Chucky" was the robber, she had little trouble obtaining the photograph and address. See *ante* at 3 n.2. In other words, if instead of being told by Ms. Thompson (the complainant) that the "assailant was the 'boy from around the neighborhood that always drove the red car and that always hung out with . . . Chucky,'" *ante* at 3 n.2, Ms. Thompson-Wright had simply heard a *rumor* to that effect, all of the other steps in the process that led to her obtaining the photograph and address could have been the same.

Not only do the photograph and information about where Mr. Jackson could be found fail to indicate that Ms. Thompson-Wright had a special familiarity with his affairs, but they do not even indicate that Ms. Thompson-Wright's source or sources had a special familiarity with Mr. Jackson's affairs. It is hardly uncommon for a person's family members and friends to have photographs of the person and to know where he or she stays, while knowing little of—or at least lacking "special familiarity" with—the person's criminal activities. If there is any correlation between possession of a person's photograph or knowledge of the person's address and special knowledge of the person's criminal activities, it is likely a weak one,

insufficient to create *reasonable* suspicion. *See White*, 496 U.S. at 332 (holding that an anonymous informant's "ability to predict respondent's future behavior"—namely, the route that respondent would take to deliver a package of cocaine—"demonstrated inside information[,] a special familiarity with respondent's affairs," and thus rendered the informant's tip sufficiently reliable—although it was a "close case"); *see also Navarette v. California*, 134 S. Ct. 1683 (2014) (finding an anonymous tip sufficiently reliable because, *inter alia*, there were reasons to believe that the informant actually witnessed the criminal activity reported, and because the informant used the 911 emergency system—thus making it possible to identify him or her later).

Second, the information that Officer Chih learned when he entered apartment 301 did little to corroborate the conclusory tip "from the neighborhood." That Mr. Jackson was inside the apartment, consistent with the tip, does not demonstrate that the "tip [was] reliable in its assertion of illegality" but merely that it was reliable in "its tendency to identify a determinate person." *J.L.*, 529 U.S. at 272 (holding that an anonymous tip that described a suspect's appearance and location and alleged that he was carrying a concealed weapon was insufficiently

corroborated by the officer's observation of the appellant, who matched the description, "hanging out" at the indicated location).[6]

Similarly, the Lewises' inaccurate statements about the presence of Mr. Jackson and his brother in the apartment are insufficient to make up for the fact

---

[6] Recently, in *Jenkins v. United States*, 152 A.3d 585 (D.C. 2017), this court held that a suspect description generated by officers who had reviewed a surveillance video and conveyed to another officer who had not seen the video was insufficient to provide the latter officer with reasonable suspicion to stop the appellant. Two of the court's reasons for reversing are pertinent here.

First, the court explained that "to support a finding of reasonable suspicion based on information passed from one police officer to another, the government must apprise the judge 'of sufficient facts to enable him to evaluate the nature and reliability of that information.'" *Jenkins*, 152 A.3d at 590 (quoting *In re T.L.L.*, 729 A.2d 334, 341 (D.C. 1999)). The government's failure to have any of the officers who had actually watched the surveillance video testify at the suppression hearing made it impossible for the trial court to determine the reliability of their description. Similarly, although the court in the present case was apprised of the basis of Ms. Thompson-Wright's tip at the suppression hearing, no officer had been aware of this information at the time that Mr. Jackson was seized. Thus, neither Officer Chih nor any other officers was able to assess the reliability of Ms. Thompson-Wright's tip.

Second, in *Jenkins*, there was "no record evidence that would support the conclusion that the video . . . watched [by the officers] had something to do with the attempted robbery—meaning that even if appellant resembled someone in the video, this would not implicate him in the attempted robbery." 152 A.3d at 591. Analogously, in the present case, Ms. Thompson-Wright did not provide any information to the officers about the source of her tip and the photograph. Thus, the officers lacked the information that they would have needed to reasonably suspect that the individual pictured in the photograph was indeed the person who committed the robbery of Ms. Thompson.

that the reliability of the anonymous tip was almost completely unknown and unverifiable. True, while one or both of the Lewises may simply have been honestly mistaken, a reasonable officer in Officer Chih's position could have concluded that they had lied.[7] But a reasonable officer could not infer from this information that the Lewises were aware of Mr. Jackson's participation in a robbery. After all, Officer Chih showed the Lewises a photograph that looked like Mr. Jackson (and also like his brother) and told them a "serious crime" had been committed and that the suspect was possibly in the apartment—indicating that Mr. Jackson and his brother were suspects. If the Lewises were willing to lie to protect Mr. Jackson and his brother from arrest, Officer Chih's actions presumably would have been sufficient to trigger this protective behavior, independent of the Lewises' knowledge of Mr. Jackson's actual criminal activities. Moreover, as this court has noted before, while a lie can "reflect consciousness of guilt" (or consciousness of a friend's guilt), it can "also reflect merely that the person . . . is afraid of the police" (or that he or she fears what the police will do to his or her friend). *Gordon v. United States*, 120 A.3d 73, 84 (D.C. 2015). Mere dishonesty by a suspect or his or her acquaintance cannot make up for a lack of "concrete

---

[7] A conclusion that the Lewises deliberately lied is in some tension with Officer Chih's testimony that the Lewises voluntarily allowed him and Officer Bonney to enter the apartment and follow Mr. Lewis back to his bedroom, making discovery of Mr. Jackson and his brother (and thus the purported lies) inevitable.

evidence" that the suspect was involved in "criminal activity." *Id.*; *see also United States v. Wilson*, 953 F.2d 116, 125 (4th Cir. 1991) ("Without stronger articulable grounds of ongoing criminal behavior, [the defendant's] falsehood is simply not sufficient cause for . . . a seizure . . . .").

Mr. Jackson's and his brother's nervousness when two police officers confronted them in the bedroom adds little. A suspect's nervousness is a relevant factor in the reasonable-suspicion analysis, but it is "not particularly probative because most citizens with nothing to hide will nonetheless manifest an understandable nervousness in the presence of [an] officer." *Wade v. State*, 422 S.W.3d 661, 670–71 (Tex. Crim. App. 2013) (internal quotation marks and citation omitted); *see State v. Moore*, 781 S.E.2d 897, 902 (S.C. 2016) (criticizing "law enforcement's reliance on the seemingly omnipresent factor of nervousness"), *cert. denied*, 136 S. Ct. 2473 (2016). In *Anderson v. United States*, 658 A.2d 1036 (D.C. 1995), for example, this court held that the defendant's "wide-eyed" nervousness, evasive act of "quickly walk[ing] away from the police," dishonest response to police questioning, and presence in a "high crime area," along with other factors, were insufficient to furnish reasonable suspicion that the defendant was engaged in criminal activity. *Id.* at 1038; *see also Gordon*, 120 A.3d at 83–84. Here, there was likewise no concrete evidence that Mr. Jackson had engaged in the

robbery earlier—there was only a general tip, without any supporting details, "from the neighborhood." As in *Anderson*, the evidence of nervousness and dishonesty was insufficient to create reasonable suspicion.

### III.

The central problem with the majority's analysis is that it fails to recognize just how weak the anonymous tip in this case was. The tip was completely lacking in detail, it came "from the neighborhood," and there was no indication that it was based on eyewitness knowledge or inside information—or indeed, that it was based on anything other than rumor. The majority fails to articulate—and I am unable to understand—how Ms. Thompson-Wright's possession of a photograph of Mr. Jackson shows that her source or sources had "inside information" or "special familiarity" with the crime. Moreover, the only part of the tip that "panned out," *ante* at 15, was that part that identified where Mr. Jackson could be found, and given the conclusory nature of the tip, this was probably the only part of the tip that could have been expected to pan out—barring the possibility that Mr. Jackson would be found with the fruits of the robbery or would immediately confess in the officers' presence. Given these serious deficiencies, I am unwilling to say that the Lewises' possible dishonesty and Mr. Jackson's and his brother's nervousness—

factors whose significance this court and other courts have rightly minimized—

were sufficient to justify the intrusions in this case.[8]  I respectfully dissent.

---

[8]  It is worth noting that although the voluntariness of the Lewises' consent to the officers' entry into their apartment is not at issue in this appeal, the officers in this case relied on Ms. Thompson-Wright's barebones and unsourced tip to gain entry.